**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No.  08-cv-01624-WJM-MJW

COLORADO ENVIRONMENTAL COALITION;
INFORMATION NETWORK FOR RESPONSIBLE MINING;
CENTER FOR NATIVE ECOSYSTEMS;
CENTER FOR BIOLOGICAL DIVERSITY; and
SHEEP MOUNTAIN ALLIANCE,

      Plaintiffs,

v.

OFFICE OF LEGACY MANAGEMENT; and
UNITED STATES DEPARTMENT OF ENERGY,

      Defendants.

---

### OPINION AND ORDER

---

This matter is before the Court on Plaintiffs' appeal seeking judicial review of

(1) Defendants' decision in 2007 to expand the Uranium Lease Management Program

("ULMP") in southwestern Colorado; (2) Defendants' issuance of leases to uranium

mining companies under the ULMP; and (3) Defendants' approvals of exploration or

reclamation activities on certain lease tracts.  The matter has been fully briefed (ECF

No. 78, 82, 88), and Defendants have submitted the administrative record to the Court

(ECF No. 19, 59).  After carefully analyzing the briefs and the administrative record, the

Court VACATES IN PART and REMANDS.

### I.  JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1331 (federal

question), and 5 U.S.C. §§ 701-706 (the Administrative Procedure Act ("APA")).[1]

## II.  BACKGROUND

### A.      Factual Background

This case involves potential uranium[2] and vanadium[3] mining on approximately 27,000 acres of land in the Uravan Mineral Belt in Mesa, Montrose, and San Miguel Counties in southwestern Colorado.  (AR002620, AR002623.[4])  The Office of Legacy Management, a division of the United States Department of Energy (collectively, "DOE"), manages the land under the ULMP.  (AR002607, AR002613.)

───────────────

[1] Plaintiffs' claims alleging violations of the National Environmental Policy Act ("NEPA") are properly construed as APA claims because NEPA does not create a private right of action.  *See Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 690 (10th Cir. 2010) ("NEPA itself does not provide for a private right of action; therefore, this court reviews an agency's approval of a project, including the agency's compliance with NEPA, under the APA.").  Plaintiffs' claims alleging violations of the Endangered Species Act ("ESA") are also governed by the APA.  *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1105 n.3 (10th Cir. 2010) ("The APA governs judicial review of agency action challenged through the ESA citizen-suit provision."); *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998) ("[I]n examining whether the [defendants'] actions violate the ESA, we rely on the standards of review provided in the APA.").

[2] Uranium can be enriched to fuel nuclear power plants, and for use in nuclear weapons.  *See* http://www.epa.gov/radiation/radionuclides/uranium.html (last visited Sept. 2, 2011); *see also* Fed. R. Evid. 201(b) (providing that judicial notice may be taken of a fact that is "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *Copar Pumice Co., Inc. v. Tidwell*, 603 F.3d 780, 791 n.3 (10th Cir. 2010) (explaining that, although judicial review of agency action is generally limited to the administrative record, a court may take judicial notice of background information that informs the court's understanding of the factual context of the case); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009) (taking judicial notice of information on government websites in APA case).

[3] Vanadium is often found in ore along with uranium, and is used primarily to make steel.  *See* http://www.atsdr.cdc.gov/substances/toxsubstance.asp?toxid=50 (last visited Sept. 2, 2011); www.nature.nps.gov/hazardssafety/toxic/vanadium.pdf (last visited Sept. 2, 2011).

[4] A cite to "AR_____" is a cite to a page or pages within the administrative record, collectively located at docket numbers 19 and 59.

2

This area in southwestern Colorado has been mined for uranium and vanadium under government programs in the past.  Following World War II, in order to develop a domestic supply of uranium to meet the nation's defense needs, Congress authorized DOE's predecessor, the Atomic Energy Commission ("AEC"), to withdraw federal lands from public use and lease them to uranium mining companies.  (AR002614.)  By 1949, approximately 25,000 acres of land had been withdrawn for uranium mining.  (*Id.*)  The first leasing program, conducted between 1949 and 1962, produced more than 1.2 million pounds of uranium and 6.8 million pounds of vanadium, and generated $5.9 million in royalties to the federal government.  (*Id.*)

In 1974, AEC initiated a second leasing program, the ULMP, involving 38 lease tracts on the same land at issue in this action, and five lease tracts in Utah and New Mexico.  (AR002615.)[5]  In 1984, lease agreements were renewed (for a second 10-year term) for 33 of these 43 lease tracts.  (AR002616.)[6]  Between 1974 and 1994, the

---

[5] AEC was abolished in 1974, and eventually replaced by DOE.  *See* Department of Energy, 1977-1994, A Summary History, http://energy.gov/sites/prod/files/edg/media/Summary_History.pdf (last visited Sept. 2, 2011).

[6] The leaseholders of the other 10 lease tracts discontinued mining operations in 1984 and performed reclamation activities on the lease tracts.  (*Id.*)

> Mining reclamation is the act of returning a mine to a long-term stable condition, or its original contour, to ensure the safe reuse of the site by both current and future generations.  When possible, a reclamation plan aims to return the affected areas to previously existing environmental conditions.  Differing views as to what is an acceptable environmental condition for reclaimed mining sites explain the varying regulatory requirements for uranium mining sites.

Envtl. Prot. Agency, Technical Report on Technologically Enhanced Naturally Occurring Radioactive Materials From Uranium Mining, Volume 1: Mining and Reclamation Background, http://www.epa.gov/radiation/docs/tenorm/402-r-08-005-voli/402-r-08-005-v1.pdf (last visited Sept. 2, 2011).
Three more leaseholders discontinued operations and reclaimed their sites between 1984 and 1994.  (*Id.*)

ULMP leaseholders produced approximately 6.5 million pounds of uranium and 33.4 million pounds of vanadium, generating $53 million in royalties to the federal government.  (*Id.*)

In 1994, the 30 remaining leases were allowed to expire, and DOE conducted an environmental assessment to determine whether to continue leasing under the ULMP. (*Id.*)  In 1995, DOE issued a Final Environmental Assessment and Finding of No Significant Impact, resolving to continue the ULMP.  (AR000001-109.)  In 1996 and 1997, DOE entered into new lease agreements with 15 leaseholders.  (AR002616.)[7] After two more leaseholders relinquished their leases in the year 2000, there were 13 active lease tracts and 25 inactive lease tracts on ULMP land.

In June 2005, with the 13 active leases nearing expiration, DOE decided to conduct another environmental assessment of the ULMP, which is the assessment at issue in this administrative appeal.  (AR000114-17.)  At that time, DOE noted that "[a] recent increase in the demand for uranium and vanadium has prompted DOE to consider extending the program, and increasing the number of leases [back] to 38 for exploration and production."  (AR000114.)[8]

On August 10, 2005, DOE invited the Bureau of Land Management ("BLM"), the United States Fish and Wildlife Service ("FWS"), and the Colorado Department of

---

[7] Between 1994 and 1997, the leaseholders of the other 15 lease tracts informed DOE that they did not want to continue with the program, and performed reclamation activities on the lease tracts.  (*Id.*)

[8] The Court also notes that, in August 2005, the Energy Policy Act of 2005 became law. *See* Energy Policy Act of 2005, Pub. L. No. 109–58, 119 Stat. 594 (2005) (codified in various titles and sections of the United States Code).  This Act sought to reestablish nuclear power as an important component of the nation's overall energy strategy.  (AR002623; ECF No. 82, at 4.)

Natural Resources to serve as cooperating agencies in the environmental assessment. (AR000154-59.)  On August 10 and 11, 2005, DOE held public scoping meetings regarding the scope of the environmental assessment to be conducted.  (AR000144-146, AR000161-175.)

In July 2006, DOE released its Draft Programmatic Environmental Assessment ("Draft EA"), which discussed three alternatives for managing the lease tracts, and the environmental effects of each.  (AR001419-1574.)  DOE also provided notice to the public and an opportunity to comment regarding the Draft EA.  (AR001417-18.) Plaintiffs, among others, submitted comments regarding the Draft EA.  (AR001625-2010.)

In July 2007, DOE released its Final Programmatic Environmental Assessment ("EA").  (AR002593-2789.)  The EA evaluated three alternatives:  (1) the Expanded Program Alternative (DOE's preferred alternative), in which the leasing program would be expanded to include 38 leases on all DOE-managed lands in the Uravan Mineral Belt; (2) the Existing Program Alternative, in which only the 13 active leases would be extended; and (3) the No Action Alternative, in which the current leases would be allowed to expire, and either DOE would continue to manage the 27,000 acres of land without leasing, or the land would be returned to the public domain under BLM's administrative control.  (AR002618-20.)[9]  The EA described the environmental setting on and near DOE's lease tracts (AR002657-84), and evaluated the likely environmental

---

[9] DOE also explicitly eliminated from consideration three other alternatives: (4) developing and maintaining uranium mines at other locations outside the Uravan Mineral Belt; (5) transferring lease management responsibilities to BLM; and (6) withdrawing from public domain additional uranium-bearing lands.  (AR002625.)

impacts of each of the three alternatives (AR002685-2736). The EA also listed the public comments to the Draft EA and DOE's responses. (AR002762-87.)

As a result of the analysis in the EA, DOE issued a Finding of No Significant Impact ("FONSI"), determining to proceed with DOE's preferred alternative of expanding the ULMP to lease all 38 lease tracts. (AR002790-2800.) The FONSI concluded that "the proposed action does not constitute a major Federal action significantly affecting the quality of the human environment. Therefore, preparation of an environmental impact statement is not required." (AR002800.)

In late 2007, DOE reconfigured the lease tracts (mostly by combining certain lease tracts) so that there were a total of 31 lease tracts. (AR019646-53.) During 2008, DOE issued leases for those 31 tracts to six different companies: Cotter Corporation (10 lease tracts), Golden Eagle Uranium, LLC (8), Energy Fuels Resources (6), Gold Eagle Mining, Inc. (3), U.S. Uranium Corporation (2), and Zenith Minerals, LLC (2). (AR005341-AR032186.)[10]

During 2009, DOE approved exploration plans on five different lease tracts, and also approved a mine re-entry plan on one of those lease tracts. (AR003052-110, AR003172-213, AR003263-314, AR003457-548, AR003578-635.) DOE also approved Reclamation in-lieu-of Royalties ("RILOR") plans on 13 different lease tracts. (AR002832-43, AR002994-3020, AR003214-31, AR003344-69, AR003696-706, AR003738-62, AR003851-902, AR003932-60, AR004020-50, AR004109-30,

---

[10] Two of the leases held by Energy Fuels Resources were originally awarded to U.S. Uranium Corporation, but U.S. Uranium Corporation later relinquished those leases. (AR004239-300.)

AR004160-82, AR004212-28, AR004331-48.)[11]

## B.   Procedural Background

On July 31, 2008, Plaintiffs filed their Complaint in this action, raising six claims alleging NEPA violations by DOE in its decision to expand the ULMP.  (ECF No. 1.) After some discovery, Plaintiffs filed a First Amended Complaint bringing 10 claims alleging violations of NEPA and ESA, and challenging DOE's decisions to expand the ULMP, to issue the 31 leases, and to approve the exploration and reclamation activities. (ECF No. 61.)[12]

On May 3, 2011, Plaintiffs filed their Opening Brief, arguing that:

(A)    DOE violated NEPA by:

(1)    Issuing the EA and FONSI rather than preparing a more detailed Environmental Impact Statement ("EIS") (this argument has several bases);

(2)    Failing to review a reasonable range of alternatives in the EA;

(3)    Failing to include in the NEPA process all federal and state agencies with jurisdiction;

(4)    Issuing the leases without NEPA compliance; and

(5)    Unlawfully relying on categorical exclusions in approving the exploration and reclamation activities; and

---

[11] Under DOE's RILOR program, "a lessee agree[s] to perform necessary reclamation services on its lease, and in return DOE agree[s] to reduce the amount of royalties that the lessee must pay to the U.S. Government."  http://www.lm.doe.gov/WorkArea/ linkit.aspx?LinkIdentifier=id&ItemID=7934&libID=8040 (last visited Sept. 2, 2011).

[12] To be precise, Plaintiffs appeal 55 final agency actions:  (a) the issuance of the EA/FONSI (1 final action); (b) the issuance of the 31 leases still in effect (31 final actions); (c) the issuance to, but later relinquishment of, two leases to U.S. Uranium Corporation (4 final actions); (d) the approvals of five exploration plans (5 final actions); (e) the approval of one mine re-entry plan (1 final action); and (f) the approvals of 13 RILOR plans (13 final actions).

(B)     DOE violated ESA:

(1)     By failing to consult with the FWS; and

(2)     Because activities performed under the ULMP may affect listed species.

(ECF No. 78, at 18-39; *see also* ECF No. 61, at 40-48.)  Plaintiffs request that the Court

set aside the final agency actions at issue.  (*Id.* at 39-40.)  DOE filed its Response Brief

(ECF No. 82), and Plaintiffs filed their Reply Brief (ECF No. 88).

DOE has also filed a Motion to Strike Extra-Record Materials (ECF No. 91), to

which Plaintiffs have filed a Response (ECF No 93).

During June and July 2011, DOE also filed with the Court three notices regarding

recent developments with the ULMP.  On June 22, 2011, DOE notified the Court of the

publication in the Federal Register of its Notice of Intent to Prepare a Programmatic

Environmental Impact Statement for the U.S. Department of Energy Uranium Leasing

Program ("NOI").  (ECF No. 83.)  *See also* 76 Fed. Reg. 36,097-36,100 (June 21,

2011).  The NOI states,

> DOE has determined that, in light of the site-specific information that DOE
> has gathered as a result of the site-specific agency actions proposed and
> approved pursuant to the July 2007 [EA]/FONSI, it is now appropriate for
> DOE to prepare [an EIS] in order to analyze the reasonably foreseeable
> environmental impacts, including the site-specific impacts, of a range of
> alternatives for the management of the ULP for the remainder of the
> ten-year period that was covered by the July 2007 [EA].

76 Fed. Reg. at 36,097.  *See also id.* at 36,098, 36,099.  (*See also* ECF No. 82, at 6.)

Then, on July 11, 2011, DOE notified the Court that it had recently sent a letter to the

lessees informing them that, *inter alia*, the EIS "is estimated to take from 12-15 months

to complete" and that "[u]nfortunately, during that time period, DOE will be unable to

approve any new ground disturbing activities on the lease tracts (*i.e.*, approve any new

8

lessee's exploration or mining plans)." (ECF No. 85 Ex. A.) Lastly, on July 25, 2011,

DOE notified the Court of the publication in the Federal Register of its Notice of Public

Scoping Meetings and Extension of Scoping Period for the U.S. Department of Energy

Uranium Leasing Program Programmatic Environmental Impact Statement. (ECF No.

89.) *See also* 76 Fed. Reg. 43,678 (July 21, 2011).

## III.  ANALYSIS

### A.    Motion to Strike

Before turning to the merits of Plaintiffs' appeal, the Court first addresses DOE's

Motion to Strike Extra-Record Materials. DOE moves to strike four state agency lease

documents cited to and described by Plaintiffs on page 11 of their Reply Brief, arguing

that the materials constitute extra-record evidence that would not be properly

considered by the Court. (ECF No. 91; ECF No. 88, at 11.) Plaintiffs respond by

arguing that the information is necessary to rebut the extra-record evidence DOE itself

recently submitted to the Court regarding its plan to effectively stay any ground

disturbing activities on the lease tracts. (ECF No. 93.)

"Motions to strike are generally disfavored, but are within the district court's

sound discretion." *Resolution Trust Corp. v. Ascher*, 839 F. Supp. 764, 765-66 (D.

Colo. 1993). While a court's review of the merits in an APA case is generally limited to

the administrative record, a court may consider extra-record materials for purposes of

determining whether it has jurisdiction over the matter before it. *See Sierra Club v.

Yeutter*, 911 F.2d 1405, 1421 (10th Cir. 1990) (holding that district court did not abuse

its discretion in considering extra-record evidence in order to determine whether it had

jurisdiction); *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997) (considering extra-record evidence "not in order to supplement the administrative record on the merits, but to determine whether [the court has] jurisdiction"); *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560-61 (9th Cir. 2000) (denying motion to strike and considering extra-record evidence in order to evaluate whether agency had rectified a prior NEPA violation after the onset of legal proceedings).

The extra-record evidence submitted or cited to by *both* parties in this action has been submitted or cited to in order to assist the Court in evaluating DOE's arguments that the action is prudentially moot and unripe.[13]  The Court has only considered the evidence for that purpose.  The Court as a consequence denies DOE's motion to strike.[14]

## B.   Prudential Mootness and Ripeness

The Court proceeds to analyze DOE's arguments that Plaintiffs' claims should be dismissed on the grounds that they are prudentially moot[15] and/or are not ripe for

---

[13] (*See* ECF No. 82, Exs. A, B, C; ECF No. 83, Ex. A; ECF No. 85, Exs. A, B; ECF No. 88, at 11; ECF No. 91, Exs. A, B.)

[14] The Court notes that, even if it had granted the motion to strike and only considered the extra-record evidence submitted by DOE, the Court would have arrived at the same conclusion, discussed *infra*, that dismissal is not appropriate on the grounds of prudential mootness or lack of ripeness.  Indeed, in considering the issues of prudential mootness and ripeness, the Court has given significant weight to the representations made in the Declaration of Laura E. Kilpatrick that "[n]o mining activities are being performed on any of the ULP leases" and that, "[w]hile the [EIS] is being prepared, DOE will not approve any new ground disturbing activities other than for the limited purposes of reclamation."  (ECF No. 82, Ex. B, at 2 ¶ 3, 3 ¶ 8.)

[15] DOE does not argue that the action is constitutionally moot.

10

judicial review.  (ECF No. 82, at 10-18.)

### 1.    Prudential Mootness

DOE argues that the case is prudentially moot because it has committed to prepare an EIS in the future, there will be no ground disturbing activities on the lease tracts before completion of the EIS, and thus, "[a]s a functional matter, the leases and the [ULMP] itself are stayed."  (*Id.* at 12.)  It argues that, therefore, "[j]udicial review of the [EA] would be hollow given that its effect on future actions will likely be of no import," and that "any relief this Court might grant [would be] without practical effect."  (*Id.* at 11-12.)

The doctrine of prudential mootness applies to controversies that, "though not moot in the strict Article III sense, [are] so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant."  *S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) (citation and internal quotation marks omitted). "Prudential mootness addresses not the power to grant relief but the court's discretion in the exercise of that power."  *Id.* (citation and internal quotation marks omitted); *see also Rio Grande*, 601 F.3d at 1122 ("Prudential mootness arises out of the court's general discretion in formulating prospective equitable remedies.") (citation and internal quotation marks omitted).  In determining whether to exercise such discretion, "the central inquiry [is whether] circumstances have changed since the beginning of the litigation that forestall any occasion for meaningful relief."  *S. Utah Wilderness Alliance*, 110 F.3d at 727.

The Court declines to exercise its authority to dismiss this action on the ground of

11

prudential mootness because there is insufficient evidence before the Court that the planned EIS will indeed be completed.  Numerous considerations lead the Court to this decision.  First, despite DOE's publication in the Federal Register of the NOI and notice regarding public scoping, such published notices do not bind DOE to actually complete the EIS.  *See, e.g.*, 76 Fed. Reg. 84-85 (Jan. 3, 2011) (federal agency withdrawal of formal, published notice of intent to prepare an EIS, and instead deciding to prepare EA); 75 Fed. Reg. 31,835-31,836 (June 4, 2010) (same); 74 Fed. Reg. 64,805 (Dec. 8, 2009) (same); 74 Fed. Reg. 9384 (Mar. 4, 2009) (same); 73 Fed. Reg. 66,687-66,688 (Nov. 10, 2008) (same); 72 Fed. Reg. 8196-8197 (Feb. 23, 2007) (same).  *But see Los Alamos Study Group v. U.S. Dep't of Energy*, No. 10-CV-760, 2011 WL 2580354, at *6 (D.N.M. May 23, 2011) (dismissing case based on prudential mootness, and in so doing attributing weight to the fact that the defendants had published their notice of intent to complete a supplemental EIS in the Federal Register).

Second, despite DOE's assurances to the Court that it intends to complete the EIS, it has provided an insufficient explanation to the Court for *why* it is now planning to conduct an EIS.  DOE's only explanation to the Court consists of the following:

> DOE determined that, in view of site-specific information gathered as a result of site-specific agency actions proposed and approved pursuant to the July 2007 [EA]/FONSI, a new [EIS] would be appropriate to analyze further the reasonably foreseeable environmental impacts, including site-specific impacts, of a range of alternatives for management of the [ULMP] for the remainder of the 10-year period covered by the July 2007 [EA].

(ECF No. 82, at 6; ECF No. 91, at 2-3.)[16]  This vague and unspecific explanation, only

---

[16] Rather than explaining to the Court in more detail what the "site-specific information" was that lead to the decision to plan an EIS, DOE simply re-quoted the vague and unspecific explanation given to the public in the NOI.  *See* 76 Fed. Reg. at 36,097 (same); *id.* at 36098

referencing unknown "site-specific information,"[17] does not give the Court any understanding of what motivated DOE to change course and plan an EIS, and therefore does not sufficiently assure the Court that the EIS will indeed be completed without unacceptable or undue delay, or at all.

Third, DOE has provided no timetable to the Court for when the EIS will be completed. Although DOE has apparently recently informed the lessees that preparation of the EIS "is expected to take from 12-15 months to complete," nothing precludes DOE from granting itself one or more extension(s) of time with which to complete the EIS, or otherwise binds DOE to that or any other time frame.

Fourth, although DOE has represented to the Court that it will not approve any new "ground disturbing activities" while the EIS is being prepared, it has specifically excluded reclamation activities, suggesting that reclamation activities may continue during preparation of the EIS. (ECF No. 82, Ex. B, at 3 ¶ 8 ("While the [EIS] is being prepared, DOE will not approve any new ground disturbing activities other than for the limited purposes of reclamation.").) This does not appear to be entirely consistent with DOE's representation that "[a]s a functional matter, the leases and the [ULMP] itself are stayed." (ECF No. 82.) And there is evidence in the record suggesting that reclamation

---

(same); *id.* at 36099 (same).

[17] In making other arguments to the Court, DOE has actually emphasized the very limited nature of the site-specific activities already conducted on the lease tracts. (*See, e.g.*, ECF No. 82, at 26 (describing the already conducted activities as "environmentally inconsequential"); *id.* at 28 (describing reclamation activities as "minor work"); *id.* at 30 (emphasizing that exploratory boreholes were small, widely scattered, and that each sampling lasted approximately one day.) This appears to be at least somewhat inconsistent with its claim that "site-specific information gathered as a result of site-specific [activities]" somehow led it to change course and prepare an EIS.

activities, while obviously designed to return the landscape to pre-existing conditions, can cause certain environmental harms.  (*See, e.g.*, AR002717 (EA stating that "[t]he closure of mine entrances would destroy potential habitat for many bat species."); AR003884-85 (letter from Colorado Division of Wildlife detailing steps necessary to "minimize disturbance and potential impacts to bats roosting in mines pending closure activities").

Fifth, despite now planning an EIS, DOE has maintained its position that it did not violate NEPA by previously issuing an EA and FONSI.  Indeed, an EIS is only required by law where a proposed action will "significantly affect[ ] the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.4.  However, DOE, in deciding to change course and prepare an EIS, has not conceded that expansion of the ULMP will significantly affect the quality of the human environment.  Instead, the only explanation DOE has provided for preparing the EIS is that a new EIS "would be appropriate to analyze further the reasonably foreseeable environmental impacts, including site-specific impacts, of a range of alternatives for management of the [ULMP]."  (ECF No. 82, at 6.)  Therefore, it does not appear that DOE concedes or even believes that its preparation of an EIS is required by law.  Thus, because its plan to conduct an EIS has been unilaterally undertaken apart (in its view) from any statutory requirement that it so do, DOE could, with some internal consistency, take the position in the future that it considers itself free to walk away from any commitment to complete the EIS.  *See Blue Ocean Preservation Soc. v. Watkins*, 767 F. Supp. 1518 (D. Haw. 1991) ("[T]he government unequivocally states its position that it is not required to prepare an EIS.  It has consistently maintained that NEPA does not require it . . . .  Thus

14

the government reaffirms its position that nothing but its own volition is prompting the preparation of the EIS, and in so doing concedes that nothing would prevent it from again changing its position.").

And sixth, as a related matter, DOE has left the EA, FONSI, and 31 leases in place, and it appears that, absent judicial intervention, it intends to do so until the EIS is actually completed.  DOE could have likely rendered this action not only prudentially moot, but constitutionally moot, by withdrawing the EA and FONSI and rescinding the 31 leases.  It chose not to do so, and so the final actions challenged by Plaintiffs are still properly before the Court.

For the aforementioned reasons, the Court declines to dismiss this action on the ground of prudential mootness.  *See S. Utah Wilderness Alliance*, 110 F.3d at 727.

### 2.    Ripeness

Based on the same claim that DOE will prepare an EIS in the future, DOE also argues that Plaintiffs' claims should be dismissed because they are unripe "inasmuch as they challenge future actions by DOE."  (ECF No. 82, at 15.)

"[A] court determines whether an agency decision is ripe for judicial review by examining the fitness of the issues for judicial decision and the hardship caused to the parties if review is withheld."  *Friends Of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1093 & n.2 (10th Cir. 2004) (citation and internal quotation marks omitted).[18]  One

---

[18] These two and only factors considered in *Friends of Marolt Park* are sometimes expressed as a three- or four-factor test.  *See, e.g.*, *Utah v. Dep't of the Interior*, 535 F.3d 1184, 1192 (10th Cir. 2008) (examining three factors:  "1) whether delayed review would cause hardship to the plaintiffs; 2) whether judicial intervention would inappropriately interfere with further administrative action; and 3) whether the courts would benefit from further factual development of the issues presented"); *Coal. for Sustainable Res., Inc. v. U.S. Forest Serv.*,

of the underlying rationales of the ripeness doctrine as it is applied to agency actions is to "protect[] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Utah v. U.S. Dep't of the Interior*, 535 F.3d at 1191-92 (citation and internal quotation marks omitted). "Ordinarily, whether the issues are fit for review depends on whether the plaintiffs challenge a final agency action. Even where an agency action is considered final, however, a claim may not be ripe if there is no direct, immediate effect on plaintiffs." *Friends Of Marolt Park*, 382 F.3d at 1093-94 (citation omitted).

In terms of "the fitness of the issues for judicial decision" factor, there are 55 agency actions being appealed here, and they are final as of the date this decision was issued (although some of them are potentially subject to being reversed in the future if DOE completes the EIS and determines to terminate the ULMP). Also, the issuance of the EA/FONSI and 31 leases has resulted in tangible effects, namely, the approvals of exploration or reclamation activities on certain lease tracts. Under these circumstances, the Court finds that "the fitness of the issues for judicial decision" factor weighs heavily in favor of a finding that the action is ripe for review. *See id.* at 1093-94 & n.2. The other factor the Court considers – the "hardship caused to the parties if review is withheld" – does not weigh heavily in either direction because, while DOE does not plan to approve any new ground disturbing activities before issuance of the EIS, it appears

---

259 F.3d 1244, 1250 (10th Cir. 2001) (examining four factors: "(1) whether the issues in the case are purely legal; (2) whether the agency action involved is 'final agency action' within the meaning of the [APA]; (3) whether the action has or will have a direct and immediate impact upon the plaintiff and (4) whether the resolution of the issues will promote effective enforcement and administration by the agency").

that DOE *does* plan to approve reclamation activities in the meantime. *Id.* at 1093 & n.2. Thus, the "fitness of the issues for judicial decision" factor is dispositive, and leads the Court to decline to dismiss the action on the ground of lack of ripeness.[19]

## C.    Merits

The Court now turns to the merits of Plaintiffs' administrative appeal.

### 1.    Standard of Review, Scope of Review, and Burden of Proof

Under the APA, a reviewing court shall set aside agency action if it is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Generally, an agency decision will be considered arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  A reviewing court should engage in a "thorough, probing, in-depth review," *Wyoming v. United States*, 279 F.3d 1214, 1238 (10th Cir. 2002) (citation omitted), with its review of the merits "generally limited to . . . the administrative record," *Garvey*, 256 F.3d at 1027 n.1.[20]

---

[19] DOE would have a compelling argument for lack of ripeness if Plaintiffs were attempting to challenge the EIS before it was completed.  But Plaintiffs are not challenging the EIS, they are challenging the issuance of the EA/FONSI and 31 leases (final agency actions that are still in place), and they are challenging the approvals of 19 site-specific activities (final agency actions that have already been acted upon).

[20] *But see supra* note 2.

However, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002) (stating that the court's review is "highly deferential").  The Court confines its review "to ascertaining whether the agency examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the decision made." *Colorado Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006).

"[T]he burden of proof rests with the appellants who challenge [the agency] action." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (citation and internal quotation marks omitted).

### 2.     NEPA Claims

#### a.     Overview of NEPA

NEPA "require[s] agencies to consider environmentally significant aspects of a proposed action." *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1162 (10th Cir. 2002).  "NEPA does not, however, require agencies to elevate environmental concerns over other appropriate considerations; it requires only that the agency take a 'hard look' at the environmental consequences before taking a major action." *Krueger*, 513 F.3d at 1178 (citation and internal quotation marks omitted).  Also, "NEPA dictates the process by which federal agencies must examine environmental impacts, but does not impose substantive limits on agency conduct." *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 821 (10th Cir. 2008).  NEPA merely guards

against "uninformed – rather than unwise – agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

> In conducting this analysis [under NEPA], the [agency] must prepare one of the following:  (1) an environmental impact statement, (2) an environmental assessment, or (3) a categorical exclusion.  An environmental impact statement involves the most rigorous analysis, and is required if a proposed action will "significantly affect[ ] the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.4.

> If an agency is uncertain whether the proposed action will significantly affect the environment, it may prepare a considerably less detailed environmental assessment.  40 C.F.R. § 1508.9.  An environmental assessment provides "sufficient evidence and analysis" to determine whether a proposed project will create a significant effect on the environment.  *Id.*  If so, the agency must then develop an environmental impact statement; if not, the environmental assessment results in a "Finding of No Significant Impact," and no further agency action is required.  *Id.*

*Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006).

> **b.    Analysis**

> **i.    DOE's issuance of an EA and FONSI rather than preparing an EIS**

Plaintiffs argue that DOE violated NEPA by issuing the EA and FONSI rather than preparing a more detailed EIS, providing several bases for the argument.  (ECF No. 78, at 21-24.)

> **(1)    Failure to evaluate site-specific impacts**

One of Plaintiffs' primary arguments is that DOE violated NEPA by failing to analyze in the EA site-specific impacts of expanding the ULMP.  (*Id.* at 21, 22, 23-24.) Indeed, DOE expressly noted in the EA that the EA "supports [DOE's] decision making on whether or not to continue the [ULMP] and provide[s] a level of detail commensurate

with that process.  It *does not attempt to assess the site-specific impacts* that might

occur on individual lease tracts of the DOE-managed lands."  (AR002613 (emphasis

added).)  In response, DOE argues, *inter alia*, that when the EA was issued, "DOE

could not know with certitude what actions would be necessary to implement the

[ULMP]," and the EA "properly deferred development of a detailed analysis of

site-specific impacts until management of the [ULMP] is crystallized through

implementation of site-specific actions."  (ECF No. 82, at 20.)

The most recent Tenth Circuit case addressing the issue of whether a federal

agency, acting in compliance with NEPA, must analyze site-specific impacts at the

leasing stage of a mineral exploration and mining program is *New Mexico ex rel.*

*Richardson v. Bureau of Land Management*, 565 F.3d 683 (10th Cir. 2009).  There, the

court first analyzed the two prior Tenth Circuit precedents addressing the same issue:

*Park County Resource Council, Inc. v. U.S. Department of Agriculture*, 817 F.2d 609

(10th Cir. 1987),[21] and *Pennaco Energy, Inc. v. U.S. Department of the Interior*, 377

F.3d 1147 (10th Cir. 2004).  Based on its analysis of those two cases, the court in *New*

*Mexico ex rel. Richardson* gave the following guidance for courts to follow in future

cases addressing this issue:

> Taken together, these cases establish that there is no bright line rule that
> site-specific analysis may wait until the . . . stage [where mining
> companies submit applications to drill].  Instead, the inquiry is necessarily
> contextual.  Looking to the standards set out by regulation and by statute,
> assessment of all "reasonably foreseeable" impacts must occur at the
> earliest practicable point, and must take place before an "irretrievable
> commitment of resources" is made.  Each of these inquiries is tied to the

---

[21] *Park County* was overruled in part on other grounds by *Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992).

existing environmental circumstances, not to the formalities of agency procedures. Thus, applying them necessarily requires a fact-specific inquiry.

565 F.3d at 717-18 (citations omitted). Analyzing those two factors, the *New Mexico ex rel. Richardson* court first held that environmental impacts *were* reasonably foreseeable at the leasing stage because considerable exploration had already occurred on adjacent land, a natural gas supply was known to exist beneath the parcels, and the company already had concrete drilling and mining plans in terms of the number of wells. *Id.* at 718-19. In terms of whether the leasing constituted an irretrievable commitment of resources, the court held that it did because of oil and gas regulations entitling the leaseholder to drill. *Id.* at 718. Thus, the court held that, under the facts of that case, the agency violated NEPA by failing to analyze site-specific impacts at the leasing stage. *Id.* at 718-19.

This Court proceeds to analyze these same two factors. In terms of whether environmental impacts were reasonably foreseeable when DOE issued its EA, the Court concludes that they were, with the relevant facts of this case much like those in *New Mexico ex rel. Richardson.*[22] Considerable exploration and mining has already occurred on these lands: indeed, uranium and vanadium mining has been taking place on these lands (on and off) since 1949. Presumably based on this history of 60+ years of mining and exploration on these very same lands, not only does DOE know that uranium

---

[22] The dispositive question is whether any environmental impacts were "reasonably foreseeable" when DOE issued the EA. DOE therefore misses the mark by arguing that "DOE could not know with *certitude* what actions would be necessary to implement the [ULMP]" and that DOE properly deferred site-specific impacts "until management of the [ULMP] is *crystallized* through implementation of site-specific actions." (ECF No. 82, at 20 (emphasis added).)

continues to exist under the ULMP lands, but DOE has precise estimates for the amount of uranium that exists and the rate that it can be extracted. (*See* EA at AR002617 ("The quantity of [uranium] ore available on DOE's lease tracts [is] currently estimated to be 13.5 million pounds" and "production from the DOE lease tracts may approach 2.0 million pounds of uranium annually.") The EA also precisely estimated the number and size of mines that will exist under the expanded ULMP, and estimated total surface disturbance at 750 acres. (*See* AR002627 (estimating the creation of 20 small mines (each employing six people and disturbing 10 acres), 20 large mines (each employing 18 people and disturbing 15 acres), and three very large mines (each employing 30 people, two of which would disturb 25 acres, and one of which would be a 200-acre open pit mine).)

The EA also indicates that DOE has learned to set precise limitations on where the mine sites can and cannot be located. (*See, e.g.*, AR002711 ("Under the Expanded Program alternative, DOE would restrict activities at existing mine sites so that they do not further encroach toward the Dolores River, and new mining activities would not be allowed within 0.25-mile of the Dolores River. Additionally, DOE would exclude tract 2 of lease tract 14 (which is extensively traversed by the Dolores River) from future leasing activities.").) Further, the EA describes in detail the specific activities that would take place on the lands, such as surface exploration, mine-site preparation, surface-plant area construction and operations, mine development and operation, and interim and permanent shutdown activities. (AR002634-55.) Thus, although DOE had not received any specific exploration or mining proposals at the time of the issuance of the EA, DOE had enough specific information regarding the lease tracts, the environmental

setting, and the likely number and size of mines such that site-specific environmental impacts of expanding the ULMP were reasonably foreseeable when DOE issued the EA.[23]

This case is distinguishable from *New Mexico ex rel. Richardson* as to whether the expansion of the ULMP would constitute an irretrievable commitment of resources. The Court is not aware of any regulations applicable to the ULMP that are equivalent to the oil and gas regulations at issue in *New Mexico ex rel. Richardson* which absolutely entitled oil and gas lessees to engage in surface disturbing activities on the lease tracts. However, this factor is not dispositive, given the compelling facts as to the other relevant factor, that environmental impacts were reasonably foreseeable when DOE issued its EA.[24]

*Park County*, the first Tenth Circuit case addressing this issue, and which is relied on heavily by DOE in its Response Brief, is distinguishable.[25] *Park County's*

---

[23] It also makes sense to point out what has actually occurred since the issuance of the EA/FONSI in terms of implementation of the ULMP.  As discussed further *infra*, DOE has approved 18 exploration or reclamation plans based on categorical exclusions.  Thus, a thorough cumulative effects analysis, including site-specific impacts, was not done during the process of creating the EA, nor was it done when actual site-specific activities were approved. If that trend were to continue, a thorough cumulative effects analysis, including site-specific impacts, might never occur.

[24] The Court's reading of *New Mexico ex rel. Richardson* does not indicate that analysis of site-specific impacts can necessarily wait until the point where "an irretrievable commitment of resources" takes place.  Instead, the opinion's important passage states that "assessment of all 'reasonably foreseeable' impacts must occur at the earliest practicable point, and must take place before an 'irretrievable commitment of resources' is made."  *New Mexico ex rel. Richardson*, 565 F.3d at 718.  While the passage indicates that the assessment *must absolutely* take place before an "irretrievable commitment of resources" occurs, thus making this a relevant factor to consider, an agency still must conduct the assessment at the earliest practicable point.

[25] The two much more recent Tenth Circuit decisions addressing the same issue have also distinguished *Park County*, and have held that the agency acted arbitrarily and capriciously by deferring analysis of site-specific impacts at the mineral leasing stage.

holding that site-specific analysis was not necessary at the leasing stage was based in part on the fact that, in that case, "full field development [was] an extremely tentative possibility at best at the leasing stage."  817 F.2d at 623.  Indeed, *Park County* explicitly stated that an argument that site-specific analysis should take place at the leasing stage "would have more force . . . if full field development were likely to occur and could be specifically described at the leasing stage."  *Id.*  Here, the Court holds that the administrative record contains sufficient evidence upon which to conclude that extensive uranium mining would have been likely to occur under the expanded ULMP, and the specifics of which were sufficiently foreseeable at the leasing stage (*e.g.*, in terms of the number and size of mines, the acreage that will be disturbed, etc.).[26]

The Court applauds DOE for planning to conduct an EIS for the ULMP that will include site-specific impacts.  However, the question before the Court is whether DOE acted arbitrarily and capriciously in failing to analyze site-specific impacts in its 2007 EA.  The Court concludes that it did.

---

[26] The Court also considers the broader context in which this ULMP expansion was approved.  In August 2005, the Energy Policy Act of 2005 became law; the Act sought to re-establish nuclear power as an important component of the nation's overall energy strategy.  (AR002623; ECF No. 82, at 4.)  Two months prior to the Act's final passage, DOE had decided to re-evaluate the ULMP program, finding that "[a] recent increase in the demand for uranium and vanadium has prompted DOE to consider extending the program, and increasing the number of leases [back] to 38 for exploration and production."  (AR000114.)  The EA also notes the recent increase of uranium mining staking claims on surrounding BLM land in this area.  (AR002734 ("In January 2007, BLM indicated that approximately 4,800 uranium mining claims have been staked/located in recent years within the three counties that encompass the DOE lease tracts.").  Further, as the Court describes in more detail in the following section of this Order, the proposed Energy Fuels uranium mill, located on land adjacent to the ULMP land, is in a fairly advanced stage in terms of obtaining the necessary government approvals.  The EA had specifically pointed out that the boom in uranium mining claims in the area, considered in combination with the expanded ULMP, might not result in actual mining unless the new uranium mill were built.  (*See* EA002734.)

### (2)     Failure to consider potential uranium mill

Another argument Plaintiffs make in this section of their Opening Brief is that

DOE violated NEPA by failing to consider the impacts of a proposed Energy Fuels

uranium mill ("the Piñon Ridge Mill").  (ECF No. 78, at 22-23.)  DOE responds by

focusing on three primary things:  (1) the mill was only in a preliminary planning stage at

the time the EA was issued; (2) the mill is being built by a company on private land, and

therefore does not involve federal action; and (3) approval of the construction of the mill

is controlled by the Nuclear Regulatory Commission ("NRC") and state agencies, not

DOE.  (ECF No. 82, at 18-19.)

The Court concludes that DOE's first argument above has merit, and on that

basis holds that DOE did not act arbitrarily and capriciously by failing to analyze the

combined impacts of the Piñon Ridge Mill with expansion of the ULMP.  On October 13,

2006, during the public comment period following DOE's issuance of the Draft EA,

Plaintiffs specifically informed DOE regarding the mill.  (AR002055-2059.)  The EA

specifically responded to this issue:

> [E]fforts to license a new mill within Paradox Valley have recently been
> reported in the local and regional press. . . .  Because no formal proposal
> has been either received or acted upon by the State of Colorado as the
> regulator, a new mill site is too speculative at this time to include in
> quantitative or qualitative analyses of this final PEA.

(AR002643; *see also* AR002734 ("There is speculation that a new mill might be built

within the Paradox Basin . . . .   However, at this time a specific location is unknown and,

therefore, a more quantified assessment of potential changes in traffic impacts is neither

warranted nor possible.")  Because no formal proposal for constructing the mill had

even been submitted to governmental permitting agencies at the time the EA was

issued (and the EA stated this to be the reason for declining to consider the effects of the mill), the Court holds that DOE did not act arbitrarily and capriciously by declining to consider the effects of the mill.  *See Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1229 (10th Cir. 2008) ("While a cumulative impact analysis requires the [reviewing agency] to include 'reasonably foreseeable' future actions in its review, improper segmentation is usually concerned with projects that have reached *the proposal stage.*") (emphasis added) (internal quotation marks omitted); *Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339, 345 (D.C. Cir. 2002) (stating that, in analyzing the cumulative effects of a proposed action, an agency must consider "other actions – past, present, *and proposed*, and reasonably foreseeable – that have had or are expected to have impacts in the same area") (emphasis added).

However, because the Court by this Order is remanding to DOE to conduct a NEPA-compliant analysis of the ULMP (and DOE has represented to the Court that it will complete an EIS), it makes sense to point out that it appears that the Piñon Ridge Mill is in a much more advanced stage as of the date of this decision.  In April 2009, Energy Fuels submitted a revised Special Use Permit Application for the mill to the Montrose County government.[27]  Montrose County approved the application in September 2009.[28]  In November 2009, Energy Fuels submitted an application to the Colorado Department of Public Health and Environment ("CDPHE") for a Radioactive

---

[27] *See* http://www.montrosecounty.net/index.aspx?nid=149 (last visited Sept. 11, 2011).

[28] *See id.*

Materials license for the mill.[29]  CDPHE approved the application, issued a preliminary

license in January 2011, and issued a final license in March 2011.[30]  In 2010, Energy

Fuels submitted to the United States Environmental Protection Agency ("EPA") an

Application for Construction Approval for materials impoundments at the mill.[31]  EPA

has notified the public, and provided an opportunity to comment, regarding its intent to

approve the application.[32]  On June 13, 2011, the Colorado Division of Reclamation,

Mining and Safety estimated that the EPA process may take up to a year to approve.[33]

Thus, it does not appear that DOE's argument that the Piñon Ridge Mill was too

speculative at the time of the EA will be applicable to DOE's NEPA analysis on remand.

DOE's other two arguments – that the effects of the mill need not be evaluated

because (1) it is being built by a company on private land, and (2) approval of the mill is

controlled by other governmental entities – lack merit.  Regardless of whether an EA or

EIS is being prepared, the agency conducting the analysis must consider the

"cumulative impacts" of the proposed action.  *See, e.g.*, *Bosworth*, 443 F.3d 732 (stating

that conducting an environmental assessment requires a cumulative impacts analysis);

---

[29] *See* http://www.cdphe.state.co.us/hm/rad/rml/energyfuels/index.htm (last visited Sept. 11, 2011).

[30] *See* http://www.cdphe.state.co.us/hm/rad/rml/energyfuels/decision/index.htm (last visited Sept. 11, 2011).)

[31] *See* http://www.epa.gov/region8/air/EPA-PINR010.pdf (last visited Sept. 11, 2011).)

[32] *See* http://www.epa.gov/region8/air/pinonridge.html (last visited Sept. 11, 2011).)

[33] *See* http://mining.state.co.us/UraniumMininginColorado.pdf (last visited Sept. 11, 2011); *see also id.* ("The Piñon Ridge Mill will be the first uranium mill constructed in the United States in almost 25 years if all permits are issued.  Energy Fuels hopes to begin construction in late 2012.").

*Davis v. Mineta*, 302 F.3d at 1125-26 (requiring that agency conduct cumulative impacts analysis in EA).  The applicable regulation defines "cumulative impact" as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions *regardless of what agency (Federal or non-Federal) or person undertakes such other actions.*  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (emphasis added).  Nothing in this regulation suggests that "cumulative impacts" are limited to those occurring on ULMP land, or that DOE need not consider the impacts from related activities that another federal agency is in charge of approving or disapproving.  Case law is in accord with the Court's interpretation of this regulation.  *See, e.g.*, *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1176-77 (10th Cir. 1999) (holding that agency had sufficiently analyzed off-site and indirect effects of its proposed action); *Colo. River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1433 (C.D. Cal. 1985) (holding that the agency should have examined, as part of its cumulative effects analysis, the indirect effects of the action on off-site locations, and in so doing rejecting agency's contention that it need only consider activities within its own jurisdiction).[34]

_____

[34] Further, the Court notes that there is evidence that the viability and profitability of uranium mining in the Uravan Mineral Belt might be directly dependent on the construction of a new uranium mill in close proximity to these lands.  (*See* http://mining.state.co.us/pdfFiles/ uranium%2520mining%2520in%2520colorado%2520on%2520drms%2520ltrhead%25202-16-0 7[1].pdf (last visited Sept. 19, 2011) (discussing Cotter Corporation's decision to close all four of its uranium mines in the Uravan Mineral Belt in 2005 "because the company was not able to make them profitable despite high prices for uranium and vanadium.  Higher energy costs and the long haulage distance (about 300 miles) from the mines to the [uranium processing mill in Cañon City, CO] played a large role in the economic difficulties of the operations.").

The Court holds that DOE did not act arbitrarily and capriciously by declining to analyze the effects of the planned Piñon Ridge Mill in the 2007 EA, given the preliminary nature of the mill at that time.

### (3) Failure to consider road access and off-lease land use

Plaintiffs also argue in this section of their Opening Brief that DOE violated NEPA by failing to consider road access and use of off-lease lands.  (ECF No. 78, at 24.)  As for road access, Plaintiffs' argument fails because the EA did explicitly consider, in detail, the effects that expansion of the ULMP would have on transportation.  (*See* AR002643-53; AR002662-63.)  In terms of other uses of off-lease lands by leaseholders, Plaintiffs' undetailed argument on this point fails to carry their burden of showing that the EA failed to sufficiently analyze such off-lease impacts.

However, given that DOE is being ordered on remand to conduct a NEPA-compliant analysis of the ULMP, it makes sense to point out that DOE is incorrect in its arguments in its Response Brief for why off-lease land uses by leaseholders need not be analyzed under NEPA.  First, it argues that "[t]he scope of off-lease land uses is speculative at best at the pre-leasing stage."  (ECF No. 82, at 22 n.7.)  This argument is unpersuasive for the same reason the argument that site-specific impacts need not be considered is unpersuasive, namely, because such impacts are reasonably foreseeable given DOE's history of managing the ULMP program and its detailed knowledge regarding the mining that would occur under the expanded ULMP (*e.g.*, how much uranium would be mined, the number and size of mines, etc).  Second, DOE argues that it need not address off-lease activities on land under BLM's jurisdiction.  (*See id.*)

29

The argument lacks merit.  Even if BLM is in control of approving such activities, that does not mean that DOE need not consider such activities in its cumulative effects analysis.  *See* 40 C.F.R. § 1508.7; *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d at 1176-77; *Colo. River Indian Tribes*, 605 F. Supp. at 1433.  DOE is ordered on remand to include in its NEPA-compliant analysis an analysis of the combined and cumulative impacts of the proposed action, including off-site activities by leaseholders.

### (4)      Remedy for NEPA violation

The Court has concluded that DOE acted arbitrarily and capriciously by failing to analyze site-specific impacts in its NEPA analysis.  The question is what the appropriate remedy is for that NEPA violation (an issue the Court discusses further *infra*).  Plaintiffs make the baseline request that "the Court should remand the [EA] and FONSI back to [DOE] for the required NEPA analysis" (without specifying what type of NEPA analysis is required).  (ECF No. 78, at 24.)  The Court agrees that this is a proper course of action.  Plaintiffs then note that the Court could go a step further and make an affirmative finding that the expansion of the ULMP will "*significantly* affect[] the quality of the human environment," which would require completion of an EIS.  42 U.S.C. § 4332(2)(C) (emphasis added).  (*See* ECF No. 78, at 24 ("[T]his Court need not simply remand the significance decision, but instead has the power to find that the foreseeable direct, indirect, and cumulative past, present and future impacts ULMP program decisionmaking meet NEPA significance criteria.").

The Court declines to make a determination regarding whether the ULMP will significantly affect the quality of the human environment.  That is DOE's role.[35]  *See Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1208 (10th Cir. 2002) ("The role of the courts in reviewing compliance with NEPA is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.") (internal quotation marks omitted); *Krueger*, 513 F.3d at 1178 (stating that NEPA requires "that the *agency* take a 'hard look' at the environmental consequences before taking a major action") (emphasis added).  In this section of the Court's decision, the Court has only held that DOE acted arbitrarily and capriciously by failing to analyze site-specific impacts in the EA.  The Court orders that DOE on remand conduct a NEPA analysis that considers and analyzes site-specific impacts of the various alternatives considered.  DOE has represented that it will do so through its completion of an EIS.  (ECF No. 82, at 6.)

> ### ii.    DOE's alleged failure to review a reasonable range of alternatives in the EA

Plaintiffs argue that DOE violated NEPA by failing to review a reasonable range of alternatives in the EA.  (ECF No. 78, at 24-27.)  Specifically, Plaintiffs first argue that DOE acted unreasonably by including in one alternative the two options of retaining the land at issue under DOE control and transferring the land to BLM's jurisdiction.  (*Id.* at 26-27.)  Plaintiffs also argue that DOE's selection of alternatives was unreasonable

---

[35] For example, the Court is not in any position to evaluate what the site-specific impacts of expanding the ULMP would be.  DOE, in collaboration with other federal agencies, is in a much better position to do so effectively.

because DOE failed to analyze the alternative of "pursuing additional withdrawals and more lease tracts."  (ECF No. 78, at 27.)

40 C.F.R. § 1508.9 provides that an environmental assessment "[s]hall include brief discussions of the need for the proposal, alternatives as required by [42 U.S.C. § 4332(2)(E)], [and] of the environmental impacts of the proposed action and alternatives . . . ."  42 U.S.C. § 4332(2)(E) provides that federal agencies shall "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

> While NEPA does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or impractical or ineffective, it does require the development of information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned.  It follows that an agency need not consider an alternative unless it is significantly distinguishable from the alternatives already considered. . . .

*New Mexico ex rel. Richardson*, 565 F.3d at 708-09 (citations and internal quotation marks omitted).

Plaintiffs have not discharged their burden of showing that DOE's selection of alternatives was arbitrary and capricious.  First, regarding DOE's inclusion in one alternative the two options of retaining the land under DOE control and transferring the land to BLM's jurisdiction, Plaintiff has not sufficiently shown that the two options have significant differences.  On this point, Plaintiffs make only vague references to "this change in regulatory status, and the resulting changes in regulatory authority to protect the environment."  (ECF No. 78, at 26.)  In so doing, Plaintiffs have not specifically demonstrated how the land under DOE jurisdiction, as opposed to BLM jurisdiction, would result in significantly different regulatory requirements in terms of environmental

protection.  The Court is therefore left to speculate regarding what those regulatory differences might be, which it declines to do.  And, as DOE points out, both DOE decisions and BLM decisions about how to govern the land would be limited by NEPA.

Plaintiffs also state that "maintaining the lease tracts for future ULMP leasing would have very different environmental consequences than conducting reclamation activities necessary to transfer to BLM," implying that BLM would require higher-quality reclamation activities than would DOE.  (*Id.* at 26-27.)  Again, Plaintiffs have not met their burden of showing that significantly different levels of reclamation activities would occur under DOE control as opposed to BLM control.  The EA itself stated that the same reclamation activities would occur no matter whether DOE or BLM had jurisdiction:

> [U]nder the No Action alternative, DOE would allow the 13 existing leases to expire in 2007 as currently scheduled.  The leaseholders would be required to reclaim their respective operations. Once final reclamation activities were completed, DOE could choose to [retain jurisdiction or transfer jurisdiction to BLM]. . . .  [T]he leaseholders would be expected to employ a reclamation workforce of approximately 60 people for a 2-year period.

(AR002628.)  Thus, there is insufficient evidence indicating that reclamation activities under DOE jurisdiction would be significantly different than those under BLM jurisdiction.[36]

Regarding Plaintiffs' argument that DOE unreasonably failed to analyze the alternative of "pursuing additional withdrawals and more lease tracts," DOE argues that

---

[36] The fact that BLM expressed concern during the comment period regarding taking control over lands on which uranium mining has occurred in the past does not establish that BLM would require higher-quality reclamation activities than would DOE.

it did consider, but eliminated from consideration, this alternative "because neither BLM nor DOE have the authority to withdraw additional lands without Congressional approval." (AR002625.)  Plaintiffs did not effectively respond to that argument in their Reply Brief.  (*See* ECF No. 88, at 14.)  Plaintiffs have not shown that DOE acted arbitrarily and capriciously by failing to select that alternative as one analyzed in detail in the EA.

### iii.    DOE's alleged failure to include in the NEPA process all federal and state agencies with jurisdiction

Plaintiffs argue that DOE acted arbitrarily and capriciously by failing to invite CDPHE and EPA to serve as "cooperating agencies" in the NEPA process under 40 C.F.R. § 1051.6.  In response, DOE argues that it was not required to invite CDPHE and EPA as cooperating agencies because neither agency has "jurisdiction by law" under 40 C.F.R. § 1501.6.

40 C.F.R. § 1501.6(a)(1) provides that a "lead agency *shall* [r]equest the participation of each cooperating agency in the NEPA process at the earliest possible time" (emphasis added).  40 C.F.R. § 1501.6 must be read in conjunction with 40 C.F.R. § 1508.5, which defines the term "cooperating agency" under the regulations.  40 C.F.R. § 1508.5 provides,

> Cooperating Agency means any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment.  The selection and responsibilities of a cooperating agency are described in § 1501.6.  A State or local agency of similar qualifications or, when the effects are on a reservation, an Indian Tribe, may by agreement with the lead agency become a cooperating agency.

Under C.F.R. 1501.6(a)(1), a lead agency must request the participation in the NEPA process of any agency fulfilling the definition of "cooperating agency" under 40 C.F.R. § 1508.5.

First, as to CDPHE, the last sentence of 40 C.F.R. § 1508.5 makes clear that CDPHE, a state agency, was by definition not a "cooperating agency" because it never reached an agreement with DOE to serve as a cooperating agency.  Therefore, DOE was not required under 40 C.F.R. § 1501.6(a)(1) to request the participation of CDPHE in the NEPA process at the earliest possible time.

However, the Court concludes that DOE *was* required to "[r]equest the participation of [EPA] in the NEPA process at the earliest possible time."  40 C.F.R. § 1501.6(a)(1).  Contrary to DOE's argument, a federal agency is a "cooperating agency in the NEPA process not only if it has "jurisdiction by law," but also if it has "special expertise" with respect to the environmental issues involved.  40 C.F.R. § 1508.5.  The EA itself indicates that EPA has special expertise with respect to uranium mining, specifically, radon emissions from uranium mines.  (AR002634 (discussing standards established by EPA governing radon emissions from uranium mines); AR002709 (same).)  *See also* 40 C.F.R. § 61.22 ("Emissions of radon-222 to the ambient air from an underground uranium mine shall not exceed those amounts that would cause any member of the public to receive in any year an effective dose equivalent of 10 mrem/y.").  *See generally* 40 C.F.R. pt. 61 subpt. B (creating "National Emission Standards for Radon Emissions from Underground Uranium Mines").

Therefore, EPA was a "cooperating agency" under 40 C.F.R. § 1508.5.  As a result, 40 C.F.R. § 1501.6(a)(1) required DOE to request participation of EPA in the

NEPA process at the earliest possible time.  The record indicates that the NEPA

process at issue began in June 2005, and DOE invited other agencies to serve as

cooperating agencies in August 2005.  However, DOE's only apparent contact with any

EPA representative during the NEPA process was sending a draft EA to the EPA

representative in July 2006.  Thus, the Court concludes that DOE violated NEPA by

failing to request the participation of EPA in the NEPA process at the earliest possible

time.  40 C.F.R. § 1501.6(a)(1).[37]

### iv.   DOE's issuance of leases allegedly without NEPA compliance

Plaintiffs argue that DOE's issuance of the 31 leases violated NEPA because no

further NEPA analysis was conducted prior to the issuance of each lease.  (ECF No. 78,

at 29-30.)  In support of their argument, Plaintiffs rely on *Southern Utah Wilderness*

*Alliance v. Norton*, 457 F. Supp. 2d 1253 (D. Utah. 2006).  There, the court held that

---

[37] While its argument is not entirely clear, DOE may be arguing that the introductory paragraph of 40 C.F.R. § 1501.6 only requires lead agencies to invite agencies that have "jurisdiction by law" to serve as cooperating agencies in the NEPA process.  If this is what DOE is arguing, the Court disagrees.  Such an interpretation would put the introductory paragraph of 40 C.F.R. § 1501.6 in direct conflict with the next provision in the regulation – 40 C.F.R. § 1501.6(a)(1) – which mandates that lead agencies invite "cooperating agencies" in the NEPA process.  One must look to the definition of "cooperating agency" under the regulations to determine what agencies the lead agency is required to invite as cooperating agencies.  In order for 40 C.F.R. § 1501.6 to be internally consistent, and consistent with 40 C.F.R. § 1508.5, the proper interpretation of the introductory paragraph of 40 C.F.R. § 1501.6 is that it speaks instead to the discretion of cooperating agencies to participate in the NEPA process.  Specifically, a cooperating agency must accept an invitation from a lead agency to serve as a cooperating agency if the cooperating agency has "jurisdiction by law," but has discretion to accept an invitation to serve as a cooperating agency if it does not have "jurisdiction by law" but does have "special expertise with respect to any environmental issue."

On a separate point, there is insufficient evidence for the Court to conclude that DOE's failure to invite EPA to serve as a cooperating agency in August 2005 was harmless.  EPA's involvement in the NEPA process may have been more substantial if it had been formally invited to serve as a cooperating agency in August 2005, rather than DOE simply sending the draft EA to a single EPA representative in June 2006.

BLM violated NEPA by issuing oil and gas leases in reliance on environmental analyses that were, in some cases, more than 30 years old. *Id.* at 1253, 1264-65. The court held that BLM should have supplemented those environmental analyses prior to issuing the leases, because of evidence in the record of "significant new information about the affected environment" that did not exist at the time of the prior environmental analyses. *Id.* at 1264-65. Here, however, the EA/FONSI was issued in July 2007, and the leases were issued during 2008. Plaintiffs have not pointed out to the Court "significant" new information that was available to DOE in 2008 that was not available to it in July 2007, which would require a supplemental environmental analysis. Thus, Plaintiffs have not met their burden of showing that DOE acted arbitrarily and capriciously by issuing leases pursuant to the EA/FONSI without conducting further environmental analyses under NEPA.

> **v.   DOE's reliance on categorical exclusions in approving exploration and reclamation activities**

Plaintiffs argue that DOE unlawfully relied on categorical exclusions in approving the exploration and reclamation activities. (ECF No. 78, at 30-36.) DOE responds by arguing that (1) the issue of DOE's use of categorical exclusions is moot because the approved exploration and reclamation activities have already been completed, and (2) DOE's use of categorical exclusions to approve the activities at issue was not arbitrary and capricious. The Court rejects DOE's first argument, but agrees with its second argument.

As for DOE's mootness argument, the Court points out that, although the Court has no power to enjoin already-conducted exploration and reclamation activities, DOE

can repeat the use of categorical exclusions for such activities under the ULMP and leases still in effect.  The issue of whether the use of categorical exclusions to approve such activities violates NEPA is therefore not moot.  *See Rio Grande*, 601 F.3d at 1122 ("A voluntary-cessation evaluation may be an important component of the overall analysis with respect to both constitutional and prudential mootness. . . .  Under both mootness doctrines, courts must assess the likelihood that defendants will recommence the challenged, allegedly offensive conduct.").

However, the Court holds that the use of categorical exclusions for these activities was not arbitrary and capricious.  NEPA regulations define categorical exclusions as "actions which do not individually or cumulatively have a significant effect on the human environment . . . and for which . . . neither an environmental assessment nor an environmental impact statement is required."  40 C.F.R. § 1508.4.  DOE regulations specifically provide that a categorical exclusion may only be utilized if the proposal is "encompassed within the classes of actions listed in the appendices to" Title 10 of the Code of Federal Regulations, Chapter X, Part 1021, Subpart D.  *See* 10 C.F.R. § 1021.400.  "When reviewing an agency's interpretation and application of its categorical exclusions under the arbitrary and capricious standard, courts are deferential."  *Krueger*, 513 F.3d at 1178; *see also Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999) ("When reviewing an agency's application of its own regulation, the agency's interpretation of its regulation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.")

## (1)    Exploration plans

The five exploration plans at issue consisted of the drilling on each lease tract of anywhere from one to eight exploratory boreholes, each approximately six inches wide and anywhere from 225 to 750 feet deep.  (AR003063, AR003179, AR003283, AR003491, AR003581.)  DOE approved the exploration activities under categorical exclusion B3.1 in its regulations entitled "Onsite and offsite site characterization and environmental monitoring . . .," with two of the approvals specifically referring to subpart B3.1(f), which categorically excludes "[s]ampling and characterization of water, soil, rock, or contaminants."  10 C.F.R. Pt. 1021, Subpt. D, App. B.  (AR003064, AR003180, AR003284, AR003495, AR003582.)  The exploratory boreholes that were drilled can reasonably be characterized as "site characterization," particularly given that an example in the regulations for "site characterization" was "soil sampling and characterization."  This use by DOE of this categorical exclusion was not arbitrary and capricious.  *See Krueger*, 513 F.3d at 1178; *Alaska Ctr. for the Env't*, 189 F.3d at 857.

## (2)    Reclamation activities

Many of the 13 RILOR plans at issue involved reclaiming abandoned mines, which generally involved closing the mine holes with boulders and rocks and/or backfilling the hole with available mine-waste rock and other surface soil materials, covering those materials with soil, and reseeding the soil.  (*See* AR002999, AR003218, AR003349, AR003862, AR003939, AR004030, AR004116, AR004168, AR004217, AR004336.)  Some of the RILOR plans involved capping drill holes with a polyurethane

foam plug, covering the plug with soil, and re-seeding the soil.  (*See* AR002835, AR003699, AR003862, AR004217.)

The reclamation activities that were conducted were all approved by DOE pursuant to categorical exclusion B1.3(k).  Categorical exclusion B1.3 applies to "routine maintenance activities . . . for buildings, structures, rights-of-way, infrastures (*e.g.*, pathways, roads, and railroads), vehicles and equipment, and localized vegetation and pest control . . . ."  *See* 10 C.F.R. Pt. 1021, Subpt. D, App. B.  The categorical exclusion provides examples of the "routine maintenance activities" applicable to the categorical exclusion, with B1.3(k) – the one utilized by DOE – being "[e]rosion control and soil stabilization measures (such as reseeding and revegetation)."  *See id.*

The use of this particular categorical exclusion for these reclamation activities presents a closer question.  It is a stretch to characterize the reclamation activities that took place as "[r]outine maintenance activities . . . for buildings, structures, rights-of-way, infrastures (*e.g.*, pathways, roads, and railroads), vehicles and equipment, and localized vegetation and pest control."  Further, the record does not indicate that the primary purpose of reclamation of abandoned uranium mines would be "erosion control" or "soil stabilization."  The use of this categorical exclusion is further questionable given that an entirely different section of DOE's categorical exclusions (B6) are "Categorical Exclusions Applicable to Environmental Restoration and Waste Management Activities."  *See* 10 C.F.R. Pt. 1021, Subpt. D, App. B.[38]  Nevertheless, the reclamation activities that took place did involve soil work and reseeding.  Therefore, the Court holds that

---

[38] It would seem prudent, for purposes of future NEPA analyses, for DOE to include a categorical exclusion under B6 that is specifically tailored to such mine reclamation activities.

DOE did not act arbitrarily and capriciously in categorically excluding the reclamation activities at issue.[39]

### 3.   ESA Claims

### a.   Overview of ESA

Under the ESA, a federal agency is required to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ."  16 U.S.C. § 1536(a)(2); *see also Rio Grande*, 601 F.3d at 1104.  To meet this obligation, the agency must "review its actions at the earliest possible time to determine whether any action *may affect* listed species or critical habitat."  50 C.F.R. § 402.14 (emphasis added); *see also Rio Grande*, 601 F.3d at 1105.  If the agency determines that an action may affect listed species or critical habitat, it must formally consult with the FWS.  50 C.F.R. § 402.14; *Rio Grande*, 601 F.3d at 1105.  "During consultation, the FWS evaluates the effects of the proposed action on the survival of the species and any potential destruction or adverse modification of critical habitat . . . ."  *Rio Grande*, 601 F.3d at 1105.

---

[39] On a broader, general level, the Court notes that the use of categorical exclusions for such activities would be even more appropriate where site-specific impacts were previously evaluated at the project level Environmental Assessment or Environmental Impact Statement.

### b.    Analysis

### i.    Plaintiffs' notice regarding intent to sue under ESA

As an initial matter, DOE argues that Plaintiffs failed to provide the required

notice under the ESA regarding their intent to sue as to 20 of the 55 final agency actions

at issue in this action.  (ECF No. 82, at 30-32.)  Specifically, it argues that Plaintiffs' April

15, 2009 notice letter to DOE regarding their intent to sue could not serve as an

effective notice as to the 20 final agency actions that occurred *after* April 15, 2009,[40]

because such a notice cannot be effective as to an act that has not yet occurred.  (*Id.* at

31.)  Second, it argues that the notice was not effective as to these 20 final agency

actions because the notice did not sufficiently describe or specifically refer to those 20

actions.  (*Id.* at 31-32.)[41]

As to DOE's first argument, nothing in the notice statute's language explicitly

prevents a notice from being effective as to a future action.  *See* 16 U.S.C. §

1540(g)(2)(A)(I).  Case law appears to be divided on the issue of whether a notice can

be effective as to a future action.  *Compare Water Keeper Alliance v. U.S. Dep't of Def.*,

271 F.3d 21, 29-30 (1st Cir. 2001) (holding that May 2000 notice was effective as to a

July 2000 agency action), *with Moden v. U.S. Fish & Wildlife Serv.*, 281 F. Supp. 2d

1193, 1206 (D. Or. 2003) ("[B]ecause the agency had not acted on the petition at the

time of the notice, plaintiffs could not have given the Secretary notice of an unlawful

---

[40] Those 20 actions are the approvals of the five exploration plans, the approvals of the 13 RILOR plans, and the relinquishments of two leases.

[41] As Plaintiffs point out (ECF No. 88, at 19), DOE's arguments do not call into question the effectiveness of the notice as to the 35 final agency actions that took place prior to April 15, 2009, which include the issuances of the EA, FONSI, and 31 leases).

action."), *and Forest Guardians v. U.S. Bureau of Reclamation*, 462 F. Supp. 2d 1177, 1183 (D.N.M. 2006) (holding that notice was not effective as to agency actions that occurred almost five years later).

However, case law is more consistent in holding that *a legal action* brought under the ESA may challenge future actions.  *See, e.g.*, *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995) ("[T]he injunctive relief authorized by the citizen suit provision, 16 U.S.C. § 1540(g), is by its very nature directed at future actions."); *Animal Welfare Inst. v. Beech Ridge Energy, LLC*, 675 F. Supp. 2d 540, 560 (D. Md. 2009) ("[T]he ESA's citizen suit provision provides for injunctive relief which by design prevents future actions that will take listed species."). Allowing a legal action to be brought under the ESA that challenges future agency actions is inconsistent with a rule that a pre-suit notice under the ESA cannot challenge future agency actions.  Allowing a pre-suit notice under the ESA to challenge future agency actions would harmonize better with the holdings of *Rosboro Lumber* and *Beech Ridge Energy*.

Instead, the determinative question (raised by DOE's second argument) is whether the notice sent by Plaintiffs contained a sufficient description of the challenged activities, thus sufficiently putting DOE on notice.  In addressing the level of specificity an ESA notice of intent to sue must have, the court in *Wyoming Farm Bureau Federation v. Babbitt*, 987 F. Supp. 1349 (D. Wyo. 1997), *rev'd on other grounds*, 199 F.3d 1224, 1230 (10th Cir. 2000), held that the notice must "provide a *generic* description of the activity alleged to constitute the violation."  *Id.* at 1363 (emphasis in original).  The Court holds that the notice was effective to challenge the subsequent

43

approvals of the five exploration plans and 13 RILOR plans.[42]  Although the notice often

specifically referred only to "uranium mining and milling," the notice also specifically

addressed concerns regarding more general "site disturbance activities" (ECF No. 78,

Ex. 7, at 9-10), and repeatedly made references to general activities on the lease tracts

(*see, e.g.*, *id.* at 7 (referring to "past, present and reasonably foreseeable other actions

on DOE lease tracts," and expressing general concerns regarding "the effects of

continuing, expanding, and implementing the [ULMP]").  Thus, the notice provided a

sufficient "generic description" of the future exploration and reclamation activities to be

challenged.  *See Wyo. Farm Bureau Fed'n*, 987 F. Supp. at 1363.

### ii.    Failure to consult with FWS

Plaintiffs argue that DOE violated the ESA by failing to consult with the FWS

regarding the potential effects of the ULMP on four endangered species of fish found in

the Colorado river downstream from the ULMP land:  the Colorado pikeminnow,

humpback chub, razorback sucker, and bonytail.[43]  In response, DOE argues that it was

not required to consult with the FWS because "DOE reasonably concluded in the [EA]

that neither the [ULMP], nor the leases issued thereunder, would have *any effect* on

listed species or critical habitat."  (ECF No. 82, at 32 (emphasis added); *see also id.* at

33-34 ("DOE concluded [in the EA] that those actions would not result in <u>any</u> effects to

listed species or designated critical habitat. . . . Because DOE determined that its action

---

[42] The Court agrees with DOE that the notice was not effective as to the two subsequent relinquishment of leases.

[43] The EA itself states that "critical habitat does exist for threatened and endangered fish downstream from the program area."  (EA002670.)

44

would not affect listed species or critical habitat, consultation with FWS was not required.") (emphasis in original).)

If DOE's representations to this Court that it came to a "no effect" determination in the EA were accurate, it is true that it would have had no duty to consult with FWS. Formal consultation is only required under the ESA if an agency comes to a determination that a proposed federal action "may affect" listed species or critical habitat. *See* 50 C.F.R. § 402.14(a) ("Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required . . . .").

However, contrary to DOE's representations, it did not arrive at a "no effect" determination in the EA. Instead, the EA states, "Impacts to threatened, endangered, and sensitive fish in the Dolores River or downstream in the Colorado River *would be highly unlikely* due to the small scale of disturbances, implementation of storm-water controls, and lack of discharge into waterways during mining operations." (AR002715 (emphasis added).)[44] DOE has improperly conflated the EA's conclusion that effects on endangered fish would be *highly unlikely* with its current position that the ULMP would have *no effect* on endangered fish. The EA does not include a "no effect" determination, it includes a determination that effects on endangered fish would be "highly unlikely," a not unimportant distinction.[45]

---

[44] The Court notes that this is the *only* analysis provided in the wildlife section of the EA as it relates to potential harms to endangered fish.

[45] Other passages in the EA confirm that "implementation of storm-water controls" and "lack of discharge into waterways during mining operations" would not necessarily result in *no* effects to the endangered fish. (*See* AR002641 ("Contaminants from mining operations that

The Court turns to evaluating whether the EA's determination that impacts to endangered fish would be "highly unlikely" triggered DOE's duty under the ESA to consult with FWS.  Again, formal consultation is required under the ESA if an agency comes to a determination that an action "may affect" listed species or critical habitat.  50 C.F.R. § 402.14(a).[46]  This "may affect" standard triggering the consultation requirement is low:  "*Any* possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement . . . ."  51 Fed. Reg. 19,926, 19,949 (June 3, 1986) (final rule) (emphasis added); *see also California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018-19 (9th Cir. 2009) (citing 51 Fed. Reg. 19,926 and stating that the threshold for triggering the consultation duty is relatively low); *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, 345 F. Supp. 2d 1151, 1174-75 (W.D. Wash. 2004) (stating that the threshold for formal consultation is low); *cf.*

---

could be discharged inadvertently to an underground or surface water source would be controlled to *minimize* the potential for their release.") (emphasis added); *id.* ("Limited rainfall throughout this region would have *minimal* potential to transport contaminants into water sources.") (emphasis added); AR002667 ("Both the Dolores and San Miguel Rivers have large seasonal fluctuations in flow, with high runoff in spring and low flow after midsummer. . . .  The water quality of the rivers varies considerably on a seasonal basis because of fluctuations in runoff."); AR002711 ("Storm-water management controls are required at all leaseholder operations to *minimize* the potential for erosion and transportation of contaminant-laden sediments.  These storm-water management controls would be designed to *reduce* runoff from lease tract operations, thus *minimizing* the amount of runoff reaching a perennial stream or river.  Therefore, potential impacts to surface water sources from storm-water runoff would be negligible.") (emphasis added).)

[46] The Court notes that the governing regulations provide for an exception to the formal consultation requirement where a determination is made that "the proposed action is *not likely* to adversely affect any listed species or critical habitat."  50 C.F.R. § 402.14(b)(1) (emphasis added).  However, DOE does not argue that this exception applies here.  And it appears that the exception indeed does not apply, because it only applies where the agency prepared a biological assessment or engaged in informal consultation with the FWS before coming to the determination (neither of which appears to have occurred here), and where the agency receives the written concurrence of the FWS in the determination (which does not appear to have occurred here).

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 538 F. Supp. 2d 242, 261 (D.D.C. 2008) (in evaluating ESA regulation requiring an initial take statement "if such take may occur," the court stated that "the term 'may' is broadly interpreted under ESA regulations and the FWS's obligation to issue an incidental take statement was triggered by the possibility of take of the brown pelican, *regardless of how unlikely that possibility may have seemed*.") (emphasis added).

The Court holds that DOE's determination that effects on listed species would be "highly unlikely" satisfies this low "may affect" standard.  Thus, DOE's own conclusion in the EA on this point triggered DOE's duty to consult with FWS.  This determination in the EA was made in July 2007.  By DOE's own admission, it still had not entered into formal consultation with FWS as of June 2011, although by that time it was planning to do so.  (*See* ECF No. 82, Ex. B, at 2-3 ¶ 6.)  In the meantime, DOE issued 31 leases, approved five exploration plans (with the exploratory boreholes already drilled), and approved 13 RILOR plans (with the reclamation activities already conducted).  This failure to consult promptly with FWS upon its reaching its conclusion in the EA violated ESA.  *See* 50 C.F.R. § 402.14(a).[47]

DOE also argues that the EA/FONSI merely approved the issuance of leases, and that "an agency's approval of a leasing program and issuance of leases does not trigger ESA consultation where the agency authorizes no surface disturbing activity . . . ."  (ECF No. 82, at 34.)  On this point, I find my colleague U.S. District Judge Marcia S.

---

[47] Because of DOE's own conclusions in the EA regarding the potential effects on endangered fish, the Court need not consider Plaintiffs' separate arguments for why the ULMP "may affect" the endangered fish.  (ECF No. 78, at 37-39.)

Krieger's analysis in *The Wilderness Society v. Wisely*, 524 F. Supp. 2d 1285 (D. Colo. 2007), to be persuasive.  There, Judge Krieger held that BLM had violated ESA by failing to engage in formal consultation with FWS, prior to its decision in the EA to resume oil and gas leasing on the South Shale Ridge in Colorado, regarding the oil and gas leasing's effects on the hookless cactus present in that area.  *Id.* at 1298-1302. The court so held because ESA requires consultation "at the earliest possible time," and BLM had already attempted to assess in the EA the impacts of leasing on the hookless cactus.  *Id.* at 1301.  The court also based its decision on the fact that no new information was gained between the issuance of the EA and the time that BLM decided to consult with ESA.  *Id.* at 1301-02.  In addition, the court so held despite evidence that BLM would be able to engage in site-specific analysis when faced with actual applications for permits to drill.  *Id.* at 1298-99, 1301.

That reasoning applies with equal or similar force here.  The ESA requires consultation "at the earliest possible time," and here DOE had already attempted to assess in the EA the impacts of leasing on the four endangered fish, coming to its own conclusion that affects on the fish would be "highly unlikely."  Also, there is no evidence in the record regarding what new information DOE learned between its issuance of the EA and its current position that consultation with FWS is proper.[48]  Therefore, following *The Wilderness Society*, the Court holds that DOE acted arbitrarily and capriciously by

---

[48] As this Court has already emphasized, *supra*, it is entirely unclear what "site-specific information" has lead DOE to change course, plan an EIS, and consult with the FWS, particularly given the fact that DOE has emphasized the very limited nature of the site-specific activities already conducted on the lease tracts.

failing to consult with FWS prior to or immediately following the issuance of the EA, in violation of the ESA.[49]

### 4.     Remedial Action

Plaintiffs request that the Court "set aside" all 55 final agency actions at issue, including the issuance of the EA/FONSI, the issuance of the 31 leases, and the approvals of the exploration and reclamation activities.  (ECF No. 78, at 39-40.)  DOE responds that, should the Court find any NEPA or ESA violation, injunctive relief is not appropriate (and even if it is, it should be narrowly tailored), given that DOE plans to complete an EIS for the ULMP.

Injunctive relief does not automatically issue, nor is it presumptively proper, upon a finding of a NEPA violation.  *See Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756-57 (2010) (rejecting prior case law holding that an injunction is presumptively proper to remedy a NEPA violation).  Instead, "the traditional four-factor test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation." *Id.* at 1256.  Under that test,

> [a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury;
> (2) that remedies available at law, such as monetary damages, are
> inadequate to compensate for that injury; (3) that, considering the balance
> of hardships between the plaintiff and defendant, a remedy in equity is

---

[49] In *Wilderness Society*, the court ultimately held that the failure to consult with FWS constituted harmless error because consultation with the FWS took place only two months later, prior even to the issuance of any leases, and so there was no reason to believe that a conference prior to issuance of the EA would have yielded any different results from the actual conference that took place two months later.  *See id.* at 1302.  That state of affairs is very much different than the situation present here, where the EA was issued in July 2007, consultation with the FWS had still not occurred as of June 2011, and in the meantime DOE issued 31 leases, approved five exploration plans (with the exploratory boreholes already drilled), and approved 13 RILOR plans (with the reclamation activities already conducted).  The Court holds that, under these circumstances, a finding of harmless error is not appropriate.

warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.*

The Court has carefully considered the four *Monsanto* factors and applied them to the facts of this case.  The Court concludes that in these circumstances injunctive relief is appropriate.  First, although DOE's violation of NEPA standing alone does not establish irreparable injury, it is a relevant factor to consider.  *See, e.g.*, *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009) ("Although a procedural violation of NEPA is not itself sufficient to establish irreparable injury, it is certainly a relevant consideration."); *see also Davis v. Mineta*, 302 F.3d at 1114 ("Congress has presumptively determined that the failure to comply with NEPA has detrimental consequences for the environment.").  Thus, given that DOE acted on the EA/FONSI in tangible ways (the issuance of the 31 leases, and the approvals of the exploration and reclamation activities), and given that those actions had tangible effects (the exploration and reclamation activities have already been conducted), the Court finds the requisite irreparable injury.  Second, the Court finds that DOE's violations cannot be adequately remedied by legal remedies such as monetary damages.  *See California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1020 (9th Cir. 2009) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages . . . .") (internal quotation marks omitted).  Third, the balance of hardships weighs heavily in favor of a remedy in equity.  And finally, the public interest, as opposed to the interests of the six uranium mining companies at issue, would not be disserved by the issuance of injunctive relief.

Therefore, through this Order, the Court issues the following injunctive relief:

(1) The 2007 EA and FONSI are hereby invalidated for being issued in violation of NEPA and ESA, and have no further legal or practical effect;

(2) The 31 leases currently in existence under the ULMP are hereby stayed. *See Conner v. Burford*, 848 F.2d 1441, 1460-61, 1462 (9th Cir. 1988) (staying leases until agencies on remand complied with NEPA and ESA); *Native Vill. of Point Hope v. Salazar*, 730 F. Supp. 2d 1009, 1019 (D. Alaska 2010) (finding NEPA violation and remanding, but declining to require agency to completely redo the permitting process at issue); *Mont. Wilderness Ass'n v. Fry,* 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006) ("The appropriate injunctive relief with regard to the gas leases is a continued suspension of activity on those leases pending full compliance by the BLM with this Court's . . . Order.");

(3) DOE is enjoined from issuing any new leases on lands governed by the ULMP. *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, Civ No. 05-0460 & 05-0488 (Dec. 7, 2009 order issued on remand from Tenth Circuit decision cited in this Order) (enjoining agency from issuing a lease "without first conducting an appropriate environmental analysis pursuant to NEPA");

(4) DOE is enjoined from approving *any* activities on lands governed by the ULMP, including exploration, drilling, mining, and reclamation activities. *See Conner*, 848 F.2d at 1461 ("As other courts also have done in similar situations, we hereby enjoin the federal defendants from permitting any surface-disturbing activity to occur on any of the leases until they have fully complied with NEPA and ESA"); *Mont. Wilderness Ass'n,* 408 F. Supp. 2d at 1038; and

(5) After Defendants conduct an environmental analysis on remand that complies with NEPA, ESA, all other governing statutes and regulations, and this Order, Defendants may move the Court to dissolve this injunction.  *See Mont. Wilderness Ass'n,* 408 F. Supp. 2d at 1039-40.

## IV.  CONCLUSION

In accordance with the foregoing, it is therefore ORDERED that:

(1)     Defendants' 2007 EA and FONSI are hereby invalidated and have no further legal or practical effect;

(2)     The 31 leases currently in existence under the ULMP are hereby stayed;

(3)     Defendants are hereby enjoined from issuing any new leases on lands governed by the ULMP;

(4)     Defendants are hereby enjoined from approving any activities on lands governed by the ULMP, including exploration, drilling, mining, and reclamation activities;

(5)     After Defendants conduct an environmental analysis on remand that fully complies with NEPA, ESA, all other governing statutes and regulations, and this Order, Defendants may move the Court to dissolve this injunction;

(6)     This matter shall be administratively CLOSED subject to the Court's continuing jurisdiction to enforce full compliance with this Order; and

(7)    Defendants' Motion to Strike Extra-Record Materials (ECF No. 91) is

DENIED.

Dated this 18th day of October, 2011.

BY THE COURT:

_____

William J. Martinez
United States District Judge